IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs August 26, 2005

**IN THE MATTER OF L.F.B. and D.M.D.**

**Appeal from the Juvenile court for Dickson County**
**No. 06-04-077-CC     A. Andrew Jackson, Judge**

_____

**No. M2005-00697-COA-R3-PT - Filed November 7, 2005**

_____

This is a mother's appeal of the termination of her parental rights to her oldest son and daughter. Because we find that there is clear and convincing evidence in the record to support the trial court's termination on three (3) alternative grounds and that termination is in the children's best interest, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court**
**Affirmed**

PATRICIA J. COTTRELL, J., delivered the opinion of the court, in which WILLIAM C. KOCH, JR., P.J., M.S., and FRANK G. CLEMENT, JR., J., joined.

Mitchell B. Dugan, Dickson, Tennessee, for the appellant, V.M.

Paul G. Summers, Attorney General and Reporter, Amy T. Master, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**OPINION**

**I. FACTS**

The children subject to this appeal are a boy, L.F.B., born in August of 1991 and a girl, D.M.D., born in April of 1998.[1] The children had different fathers. The trial court terminated the parental rights of their Mother and both fathers. Only the Mother appealed the termination.

---

[1] While not subject to the trial court's termination order, it is important to note that Mother has a third, youngest child, J. Mother's rights to J. are not the subject of the trial court's order since J. had not been taken into custody in Tennessee. Apparently, J. has been with his Mother out-of-state, but at the time of trial was the subject of an investigation in South Carolina.

The two children, L.F.B. and D.M.D., came into DCS custody on January 22, 2003, when the Dickson police found the children with D.M.D.'s father walking on the highway after their car had broken down. L.F.B. was age 11 and D.M.D. was age 4. The father told police he had taken the children away from their Mother in Mississippi because of her crack cocaine habit. Since there was an outstanding warrant in another state for the father, he was taken into police custody. At the time the children were taken into custody, Mother, who lived in Mississippi, was approximately twenty-nine (29) years old.

At that time, the Child Protective Services ("CPS") Investigator, Ms. Tiffany Evans, learned from the children that Mother had exposed them to her drug use and frequently left them alone. Tennessee CPS Investigators contacted their Mississippi counterparts and learned that the children were the subjects of an investigation in Mississippi arising from Mother allegedly exposing the children to drugs and arising from alleged sexual abuse by a babysitter. There is no record that the children were subject to any court orders in Mississippi. The authorities in Mississippi indicated that it was difficult to resolve their investigation since they had problems locating Mother and her children.[2]

DCS then filed a petition for protective custody. Ms. Evans contacted Mother by phone on the night the children came into custody to explain why the children were in custody and that the preliminary hearing was set for January 28, 2003. When Mother expressed concern that she did not have transportation to Dickson from her home in Ocean Springs, Mississippi, Ms. Evans suggested several resources including the Mississippi Department of Human Services and told Mother who to contact to arrange to have counsel appointed. Although Ms. Evans and Mother spoke several times before the preliminary hearing, Mother did not attend the hearing. At trial, Mother explained she could not get to Tennessee for the preliminary hearing due to lack of transportation and since she had to care for J., her youngest child. Mother also admitted, however, that she sent J. to his grandmother during this time and that she was able to travel between Jackson, Mississippi, where she worked, and Ocean Springs, Mississippi.

At the time the children were taken into custody, Mary Cunningham was assigned as their case worker and remained their case worker throughout these proceedings. On February 18, 2003, Mother attended the staffing for the children's Permanency Plans. Mother did not visit the children when she was in Dickson for the staffing, although she was given that opportunity. The plans for L.F.B. and D.M.D. were basically identical and stated as their goal to either return both children to Mother, adoption, or placement with a relative within one (1) year. The plans identified the following tasks for Mother to accomplish in order to be reunited with her children:

1.    Cooperate with the Mississippi and Tennessee investigations;
2.    Attend and complete parenting classes;

_____

[2] The CPS Investigator later learned Mother had been indicted in Ohio years earlier for neglect of L.F.B. Her son was taken into custody and lived with his great grandmother for a period of years. The record is not clear on how long Mother lost custody of L.F.B., from 2 to 4 years. Ultimately, Mother regained custody.

3.      Arrange and attend supervised visits with her children;
4.      Attend court proceedings and staffings;
5.      Complete an alcohol and drug assessment and follow recommendations, including treatment;
6.      Submit to random drug screens;
7.      Attend Alcoholics or Narcotics Anonymous;
8.      Maintain and show proof of employment;
9.      Submit to a home study; and
10.     Participate in therapy.

Obviously, some of the requirements of the Parenting Plans targeted Mother's use of drugs. Admittedly, she started using crack when she was 18 years old. Mother's counselor later reported that Mother said the habit cost between Three Hundred Dollars ($300) and One-Thousand Dollars ($1,000) per day.[3]

At the February 2003 staffing, Mother refused to sign the Permanency Plan and at trial she explained that her refusal was based upon advice of non-present counsel. While testifying at trial, Mother acknowledged her participation in the staffing, that she received a copy of it, and that DCS staff explained it to her, including the Criteria and Procedures for Termination of Parental Rights included in the Parenting Plan, which explained, among other grounds, the definition of abandonment.

At the time the children were taken into custody, Mother lived in Ocean Springs, Mississippi and worked in Jackson, Mississippi. While living in Ocean Springs, Mother told the CPS Investigator that she and her boyfriend were considering buying a house there. While the children were allowed to call their Mother every Saturday, this contact ended after 3 or 4 months when Mother's telephone was disconnected. On April 7, 2003, Mother visited her children to celebrate her daughter's birthday. She would not see her children again for 14 months.[4] Around June of 2003, Mother left Ocean Springs, Mississippi, and moved to South Haven, Mississippi which is a suburb of Memphis, Tennessee. At some point, Mother moved to Memphis. Her DCS case worker, Ms. Cunningham, testified that when Mother would relocate, she would not always appraise DCS of her whereabouts, sometimes for months, and even refused to disclose her location.

Approximately ten (10) months after the children were taken into custody, on October 22, 2003, the juvenile court held an adjudication hearing on DCS's Petition for Temporary Custody. Although Mother acknowledges that she received notice of the hearing, she did not attend. Her case worker testified that she notified Mother about these proceedings and explained how Mother could get an attorney. The trial court found the children were dependent and neglected and placed them in the custody of DCS. The Adjudication Hearing Order was entered on December 3, 2003. At the

---

[3]At trial, Mother said her counselor misunderstood her and said that this was the cost per week, not per day.

[4]Mother acknowledged at the hearing that DCS did not hinder her visitation.

time of this adjudicatory hearing, Mother had visited the children one time, called the case worker four (4) times, and refused to disclose her address to the case worker. Mother later testified that she was living in Memphis at the time of this hearing.

In November of 2003, the children were both placed in a foster home where they remained at the time of trial. By all accounts, the children's placement with their foster family has been successful, resulting in a loving and supportive environment for the children. Their foster mother is a DCS case worker. Their foster father testified that if given the opportunity, they would like to adopt the children.

In December of 2003, Mother moved to Slidell, Louisiana where she enrolled in Remington College to train to become a Pharmacist Technician. She dropped out of school, and in March of 2004 Mother moved to Santee, South Carolina.

The record reflects that from the time the Mother visited the children in April of 2003, until the State petitioned to terminate parental rights in June of 2004, approximately 14 months, Mother had no contact with the children by phone or visitation.[5]

The children's case worker testified that during the period between January of 2003, when the children came into custody, and June of 2004, when DCS petitioned to terminate parental rights, Mother did not notify DCS when she moved or her whereabouts. Ms. Cunningham testified that Mother would not disclose her location, go months without calling, and then when she would call, Mother would refuse to tell Ms. Cunningham where she could be reached. Ms. Cunningham was able to get a general idea of her whereabouts only from caller identification. For example, Ms. Cunningham did not hear from Mother in May, June or July of 2003. Mother called in August of 2003, refused to tell Ms. Cunningham where she was, and then did not contact Ms. Cunningham again until November of 2003. When Mother called in November of 2003, Ms. Cunningham again explained to Mother the Parenting Plan and offered to mail her another copy. Again, Mother refused to disclose her location. After her November, 2003 call, Ms. Cunningham then did not hear from Mother again until March of 2004. In April of 2004, Mother called Ms. Cunningham a few times and scheduled a visit of the children in May of 2004. Mother did not appear or call to cancel the May 2004 visit.

In June of 2004, DCS petitioned the court to terminate the parental rights of Mother and both fathers[6] for abandonment under Tenn. Code Ann. § 36-1-113(g)(1), substantial failure to comply with the Permanency Plan under Tenn. Code Ann. § 36-1-113(g)(2), and persistence of conditions

---

[5]At some point the record reflects that Mother sent letters to the children that Ms. Cunningham intercepted since she believed the letters would upset the children. Mother testified she sent 15 to 20 letters. When these letters were sent is not in the record. Ms. Cunningham testified that she later gave the letters to the children.

[6]On October 4, 2004, the court entered an order terminating the parental rights of the children's fathers. That order was not appealed.

that prevented the children's return to the home after six (6) months in foster care under Tenn. Code Ann. §36-1-113(g)(3).

Between the time the State filed its petition in June of 2004 and the hearing in February of 2005, Mother visited her children six (6) times and cancelled another six (6) scheduled visits.

The hearing on the petition to terminate Mother's parental rights was held on February 7, 2005. Mother was present and represented by counsel. The court heard testimony from 2 CPS investigators, the case worker, Mother, the children's foster father, 13-year-old L.F.B. and L.F.B.'s counselor.

On March 9, 2005, the trial court entered an order terminating Mother's parental rights after finding clear and convincing evidence of: (a) abandonment under Tenn. Code Ann. § 36-1-113(g)(1); (b) persistence of conditions under Tenn. Code Ann. § 36-1-113(g)(3); and (c) substantial failure to follow the parenting plan under Tenn. Code Ann. § 36-1-113(g)(2). Further, the court found there was clear and convincing evidence that termination of Mother's parental rights was in the children's best interest pursuant to Tenn. Code Ann. § 36-1-113(i).

Mother appeals claiming that Tennessee was without subject matter jurisdiction to entertain the termination of her parental rights petition since Tennessee was not the children's home state. Alternatively, if jurisdiction exists, Mother argues there was not clear and convincing evidence in the record to support the trial court's decision to terminate.

## II. STANDARD FOR TERMINATION OF PARENTAL RIGHTS

A court may terminate a person's parental rights only if (1) the existence of at least one statutory ground is proved by clear and convincing evidence and (2) it is shown, also by clear and convincing evidence, that termination of the parent's rights is in the best interest of the child. Tenn. Code Ann. § 36-6-113(c); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). The higher evidentiary standard, as well as procedural safeguards, exist to prevent unwarranted government interference with a parent's fundamental and constitutionally protected right to the care and custody of his or her children.[7] Because of the severity of the consequences of a decision to terminate parental rights, such proceedings must insure protection of that right.

Our legislature has identified those situations in which the state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought. Tenn. Code Ann. § 36-1-113(g). The statutes on

---

[7]A parent has a fundamental right to the care, custody and control of his or her child. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212-13 (1972); *Nash-Putnam v. McCloud*, 921 S.W.2d 170, 174-75 (Tenn.1996); *In Re Adoption of a Female Child*, 896 S.W.2d 546, 547 (Tenn.1995); *Nale v. Robertson*, 871 S.W.2d 674, 678 (Tenn.1994). This right is a fundamental but not absolute right, and the state may interfere with parental rights if there is a compelling state interest in protecting the welfare of the child. *Santosky v. Kramer*, 455 U.S. 745, 747, 102 S. Ct. 1388, 1391 (1982); *Nash-Putnam*, 921 S.W.2d at 174-75.

termination of parental rights provide the only authority for a court to terminate a parent's rights. *Osborn v. Marr*, 127 S.W.3d 737, 739 (Tenn. 2004). Thus, parental rights may be terminated only where a statutorily defined ground exists. Tenn. Code Ann. § 36-1-113(c)(1); *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re M.W.A.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). To support the termination of parental rights, only one ground need be proved, so long as it is proved by clear and convincing evidence. *In the Matter of D.L.B.*, 118 S.W.3d 360, 367 (Tenn. 2003).

The requisite higher standard of proof applicable to both grounds and best interest is one of the safeguards necessitated by the severity of the interference with the parent's fundamental rights. In order to be clear and convincing, evidence must eliminate any serious or substantial doubt about the correctness of the conclusions to be drawn from the evidence. *In re Valentine*, 79 S.W.3d at 546; *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992). Such evidence should produce in the fact-finder's mind a firm belief or conviction as to the truth of the allegations sought to be established. *In re A.D.A.*, 84 S.W.3d 592, 596 (Tenn. Ct. App. 2002); *In re C. W. W.*, 37 S.W.3d 467, 474 (Tenn. Ct. App. 2000). In contrast to the preponderance of the evidence standard, clear and convincing evidence should demonstrate that the truth of the facts asserted is "highly probable" as opposed to merely "more probable" than not. *In re C. W. W.*, 37 S.W.3d at 474; *see also Estate of Acuff v. O'Linger*, 56 S.W.3d 527, 537 (Tenn. Ct. App. 2001).

Due to the grave consequences that accompany such decisions, courts must apply individualized decision-making to a termination decision. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999). Due process requires the application of stringent standards to insure protection of the fundamental rights at stake. Because of the constitutional implications, gravity of consequences, higher standard of proof, and required individualized decision making, our legislature has explicitly required that courts making termination of parental rights decisions "enter an order which makes specific findings of fact and conclusions of law." Tenn. Code Ann. § 36-1-113(k). In this court's review, we must determine *de novo* whether DCS sustained its burden to prove its case by clear and convincing evidence. *In re Valentine*, 79 S.W.3d at 546.

### III. JURISDICTION

Since the jurisdictional error alleged by Mother may be dispositive of her appeal, we address it first. Mother challenges whether Tennessee is the children's home state for purposes of establishing subject matter jurisdiction under the Uniform Child Custody Jurisdiction and Enforcement Act, Tenn. Code Ann. § 36-6-201 *et seq.* ("UCCJEA"). A state is a child's home state if a child has "lived with a parent or a person acting as a parent for at least six (6) consecutive months immediately before commencement of a child custody proceeding." Tenn. Code Ann. § 36-6-205(7). "Child custody proceeding" is defined to include "termination of a parental rights." Tenn. Code Ann. § 36-6-205(4). Since the children had been in the custody of DCS, and had lived with foster parents, more than six (6) months before DCS filed its petition to terminate parental rights, Tennessee was the children's home state in June of 2004 when the petition was filed.

Although termination of parental rights proceeding "is a new and separate proceeding from a dependent neglect proceeding," *In re M.J.B.*, 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004), Mother appears to challenge the initial taking into custody by DCS, asserting that Tennessee was not then the home state and the children should have been returned to Mississippi. Although the record before us does not include the order of January 2003, the trial court's later dependency and neglect order recounts the situation at the time the children first came into DCS custody.

The children were found walking on the interstate with D.D.'s father who, it turned out, had an outstanding warrant against him in Indiana and was taken into custody. Mother was called in Mississippi, but did not come to Tennessee until three weeks later, and then for a visit. At the time, there was an open investigation of the family ongoing in Mississippi. As the court found, the children were dependent and neglected because they were without a proper guardian. Consequently, the trial court had jurisdiction when the children first came into DCS custody under Tenn. Code Ann. § 36-6-219(a) and (b):

> (a) A court of this state has temporary emergency jurisdiction if the child is present in this state and the child has been abandoned or it is necessary in an emergency to protect the child because the child, or a sibling or parent of the child, is subjected to or threatened with mistreatment or abuse.

> (b) If there is no previous child custody determination that is entitled to be enforced under this part and a child custody proceeding has not been commenced in a court of a state having jurisdiction under §§ 36-6-216–36-6-218, a child-custody determination made under this section remains in effect until an order is obtained from a court of a state having jurisdiction under §§ 36-6-216–36-6-218. If a child custody proceeding has not been or is not commenced in a court of a state having jurisdiction under §§ 36-6-216–36-6-218, a child custody determination made under this section becomes a final determination, if it so provides and this state becomes the home state of the child.

When the juvenile court was presented with the children in January of 2003, based on the proof introduced at the hearing, it clearly had emergency jurisdiction under Tenn. Code Ann. § 36-6-219(a) to take the children into custody. The children were abandoned in Tennessee.[8] Their adult guardian was in police custody and their Mother did not attempt to appear or exercise custody. Under subsection (b), there is no indication in the record that there existed a current child custody determination from any other state. DCS contacted its Mississippi counterpart. Furthermore, no proceedings were initiated in any other state with even purported jurisdiction. Therefore, pursuant to Tenn. Code Ann. § 36-6-219(b), since Tennessee assumed emergency jurisdiction and no action

---

[8]Mother tries to argue that the children were in Tennessee due to kidnapping by D.D.'s father. The trial court did not find this to be the case, and Mother admittedly filed no charges with the authorities about any kidnapping. In any event, DCS, rather than the father, obtained custody of the children and contacted Mother as well as officials in Mississippi.

was taken in another state with even possible jurisdiction, then Tennessee was the children's home state for purposes of jurisdiction to entertain the petition of DCS to terminate parental rights.[9]

## IV. ABANDONMENT

Among the grounds alleged by DCS in its petition, and found by the trial court to have been shown, was abandonment, as defined by a specific subsection of the statute defining that term:

> (i) For a period of four (4) consecutive months immediately preceding the fling of a proceeding or pleading to terminate the parental rights of the parent(s) . . that the parent(s) . . . either have willfully failed to visit or have willfully failed to support or have willfully failed to make reasonable payments toward the support of the child;

> (ii) The child has been removed from the home of the parent(s) as a result of a petition filed in the juvenile court in which the child was found to be a dependent and neglected child . . . and for a period of four (4) months following the removal, the department or agency has made reasonable efforts to assist the parent(s) or guardian(s) to establish a suitable home for the child, but that the parent(s) or guardian(s) have made no reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date.

Tenn. Code Ann. § 36-1-102(1)(A) (i) and (ii).

The trial court found abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(i), willful failure to visit.[10] The record is clear that Mother did not visit or otherwise contact her children in the four (4) month period (February - May) before DCS filed to terminate in June of 2004. In order to constitute abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(i), however, Mother's failure to visit must be willful, *i.e.*, that she knew of the duty, that she had the ability, and voluntarily chose not to visit. *See In re M.J.B.* and *M.W.S., Jr.*, 140 S.W.3d 643, 654 (Tenn. Ct. App. 2004). There is clear and convincing evidence in the record to support the trial court's finding of willfulness. First, the parenting plan clearly described both the duty and consequences. It is important to note that not only did Mother not visit the children, she would not even disclose her location to their case worker. During this four (4) month period, in March of 2004, Mother moved from Louisiana to

---

[9] There is no dispute that the juvenile court has authority to terminate rights assuming that Tennessee has subject matter jurisdiction.

[10] The trial court also found abandonment based on failure to support. The evidence is ambiguous regarding whether Mother understood she had this duty since the Parenting Plans were silent on this issue and does not clearly establish Mother's ability to provide support. Since abandonment is clearly present based on failure to visit, we find it unnecessary to discuss Mother's failure to support. The trial court also found abandonment under Tenn. Code Ann. § 36-1-102(1)(A)(ii) but we do not need to consider that basis since the grounds of abandonment has otherwise been proven under Tenn. Code Ann. § 36-1-102(1)(A)(i).

Santee, South Carolina so she was clearly mobile. Most importantly, when asked why she did not move to Tennessee to be nearer her children, she replied that she wanted a fresh start, "just wanted to go somewhere else." *See In re D.M.S., G.H.S. and T.M.S.*, No. M2004-02584-COA-R3-PT, 2005 WL 1887526, at *9-10 (Tenn. Ct. App. August 9, 2005) (No Tenn. R. App. P. 11 application filed) (finding decision by mother to live 500 miles away from children constituted willfulness for purposes of abandonment). Under these circumstances, we agree with the trial court's finding of willfulness in her failure to visit under Tenn. Code Ann. § 36-1-102(1)(A)(i).

## V. FAILURE TO COMPLY WITH PERMANENCY PLAN

The standards for reviewing termination of parental rights based on substantial failure to comply with a permanency plan under Tenn. Code Ann. § 36-1-113(g)(2) have been discussed by the Tennessee Supreme Court in *In re Valentine*, 79 S.W.3d 539 (Tenn. 2002). Prior to terminating a parent's rights on this ground, the trial court must find that the requirements of the permanency plan that the parent allegedly did not satisfy are "reasonable and are related to remedying the conditions which necessitate foster care placement." *Id*. at 547 (quoting Tenn. Code Ann. § 37-2-403(a)(2)(C)). If the trial court fails to make this finding, this court must review the trial court's decision *de novo* without a presumption of correctness. *In re Valentine*, 79 S.W.3d at 547. Determining whether substantial noncompliance exists is a question of law that must also be reviewed without a presumption of correctness. *Id.* at 548.

The trial court approved both Parenting Plans on February 26, 2003, finding them to be reasonable. Mother has never disputed the reasonableness of the plans at the staffing, at trial or on appeal. Upon review of the plans, we likewise find they are reasonable.

In order for noncompliance to justify the termination of parental rights, it must be "substantial." In other words, mere technical noncompliance alone is not sufficient to justify the termination of parental rights. *Id.* at 548. Noncompliance with requirements in a permanency plan that are neither reasonable nor related to remedying the conditions that led to the removal of the child from the parent's custody is not relevant for purposes of Tenn. Code Ann. § 36-1-113(g)(2). *In re Valentine*, 79 S.W.3d at 548-49.

There is clear and convincing evidence that Mother failed to substantially comply with virtually all aspects of the children's Permanency Plans. Mother failed to cooperate with DCS in may ways, most significantly her unwillingness to disclose her various residential locations. By her own admission, she did not take parenting classes. As discussed previously, she did not stay in contact with her children. She did not attend AA or NA meetings. While it appears she is now seeing a counselor in Santee, South Carolina, other than self-reporting types of reviews, she has not undertaken an A&D Assessment. Mother has not submitted to a home study. Furthermore, she has never submitted to random drug tests. The Parenting Plan required proof of employment that Mother has not offered. While Mother testified at the hearing that she had recently remarried, established a home and had a job, the trial court did not find her testimony credible. The inconsistencies and inaccuracies in Mother's testimony are apparent. Other than starting to see a counselor in July of

2004 and appearing at the termination hearing, Mother does not appear to have even attempted to comply with the plans. Therefore, the trial court had ample grounds to find Mother failed to substantially comply with the parenting plan.

## VI. PERSISTENCE OF CONDITIONS

In the present case, the trial court terminated Mother's parental rights pursuant to the provisions of Tenn. Code Ann. § 36-1-113(g)(3)(A). This statute lists as one of the grounds for termination:

> (3)(A) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and;
> (i) The conditions which led to the child's removal or other conditions which in all reasonable probability would cause the child to be subjected to further abuse or neglect and which, therefore, prevent the child's safe return to the care of the parent, still persist;
> (ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent(s) or guardian(s) in the near future; and
> (iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

These grounds must be interpreted and applied in accordance with the express legislative intent of our statutory system of child removal, foster care, and adoption. One of the stated purposes of these statutes is "to protect [children] from needless prolonged placement in foster care and the uncertainty it provides, and to provide them a reasonable assurance that, if an early return to the care of their parents is not possible, they will be placed in a permanent home at an early date." Tenn. Code Ann. § 37-2-401(a). Our courts have recognized the significance of permanency as the goal of decisions involving future placement of children and termination of parental rights. *See, e.g., State Dep't of Human Servs.v. Smith,* 785 S.W.2d 336, 338 (Tenn.1990).

As required for the application of the statute, the children have been in custody more than six (6) months. The immediate cause for the children coming into DCS custody was their being without a guardian when D.D.'s father was taken into custody. The permanency plans make it clear the underlying condition that made it unsafe for the children to be returned to Mother's home was her drug use. As the statute makes clear, the "conditions" likely to lead to future neglect and that prevent safe return of the children may be the conditions leading to removal or "other conditions."

Review of the record discloses that much of Mother's neglect of the children stems from her use of crack cocaine. She began using crack at age 18 and told her counselor that she had spent $300 to $1,000 per day (or per week) to support her habit. While she testified that she had stopped using, there is no reason to find her testimony credible. While she testified at trial she stopped using crack in 2002, there have been no regular random drug screens. The report she introduced from her

counselor disputes Mother's assertion that she quit in 2002 and states that Mother told the counselor she stopped using cocaine in early 2004. However, in September of 2004, when Mother made an appearance in court, she tested positive for cocaine. At the hearing, her son testified in detail about his Mother's drug use and its effects. Sadly, it does not appear that these conditions will be remedied and continuation of the parent and child relationship greatly diminishes these children's chances of a stable, safe and permanent home. Based on the foregoing, this is clear and convincing evidence to support the trial court's termination of her rights for persistent conditions under Tenn. Code Ann. § 36-1-113(g)(3).

## VII. REASONABLE EFFORTS

While not explicitly raised by Mother on appeal, she argues her failures were not her fault and implies that DCS did not make reasonable efforts to reunite Mother and her children. Reasonable effort has been defined by the General Assembly to mean "the exercise of reasonable care and diligence by DCS to provide services related to meeting the needs of the child and family." Tenn. Code Ann. § 37-1-116(g)(1). One factor to consider is the parent's efforts to remedy the situation so that reunification is possible. *In re J.L.E.*, 2005 W.L. 1541862 at *13; *In re C.M.M.*, 2004 WL 438326 at *7.

The children's DCS case worker, Mary Cunningham, kept thorough records of her contacts with Mother. Ms. Cunningham readily acknowledged that DCS had not provided certain types of services to Mother. DCS's failure to assist Mother did not arise from unwillingness or neglect of DCS. DCS was not able to help Mother because she moved frequently and would go months without letting DCS know her location. Sometimes Mother would call Ms. Cunningham and flatly refuse to tell her where she was. It was only by backtracking through caller ID was Ms. Cunningham able to determine what state and city Mother was located. According to Ms. Cunningham, it is not possible to provide these types of services to someone out-of-state who moves frequently and refuses to disclose their location. We agree. The trial court noted its belief that Mother was reluctant to disclose her location out of concern that if she did so, then she might lose custody of her youngest son, J. Her counselor noted this was the reason Mother was reluctant to seek help. In effect, for whatever reason, Mother was avoiding DCS. The effort of DCS must be reasonable and we agree with the trial court that there is clear and convincing evidence that DCS's efforts were reasonable under these circumstances.

## VIII. BEST INTERESTS OF CHILDREN

Finally, in order to terminate parental rights, a trial court must find it is in the child's best interest to do so. Tenn. Code Ann. § 36-1-113(c)(2). In determining whether termination of parental rights is in a child's best interest, the lower court must consider the following factors:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

-11-

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol or controlled substances as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). This list is not exhaustive, and the statute does not require the court to find the existence of every factor before concluding that termination is in a child's best interest.

Here, Mother has had no contact with her children for months. Only after DCS filed its petition to terminate in June of 2004, did mother begin to visit the children and then she had only six (6) visits before the hearing date of February 2005. During this period Mother also cancelled six (6) visits. As late as September of 2004, Mother still tested positive for cocaine. It is also clear that Mother has not taken the necessary steps to make an adjustment so that the children could safely return to her custody. Instead, she let them remain in foster care with little or no contact from her while she moved around. The children have been with their foster parents since November of 2003. By all accounts, the children are doing well with their foster parents who want to adopt them. We believe that the record contains clear and convincing evidence that termination of Mother's parental rights is in the children's best interest.

For the reasons set forth herein, we affirm the decision of the trial court in terminating Mother's parental rights. Costs of this appeal are taxed to Mother, for which execution may issue if necessary.

_____
PATRICIA J. COTTRELL, JUDGE